UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**BRIAN L. SPENCER**,                     Case No. 1:11 CV 328

                    Plaintiff,            Judge Solomon Oliver, Jr.

        v.                                REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY,**

                    Defendant.            Magistrate Judge James R. Knepp, II

### INTRODUCTION

Plaintiff Brian L. Spencer appeals the administrative denial of Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under 42 U.S.C. § 1383. The district court has jurisdiction over this case under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). For the reasons given below, the Court recommends the case be remanded to the Commissioner.

### BACKGROUND

Plaintiff filed applications for DIB and SSI on October 25, 2006, alleging a disability onset date of March 1, 2005. (Tr. 45, 46, 86, 92, 100). Plaintiff's last date of meeting the insured status requirement for DIB was March 31, 2009. (Tr. 95). Born in July 1969, Plaintiff was 39 years old at the time of the ALJ's hearing. (Tr. 45).

Medical History

Plaintiff's primary alleged impairments are costochondritis, Crohn's disease, and anxiety. (Tr. 100). Plaintiff's medical history is full of emergency room visits brought on by chest pain and exacerbations of his Crohn's disease. Multiple records from treating physicians in the transcript also suggest that Plaintiff has lupus or another autoimmune disorder. (Tr. 187, 198). In an initial

disability report, Plaintiff reported being nauseated "all the time". (Tr. 100). Plaintiff succinctly summarized his conditions on one of the forms submitted to the Social Security Administration: "I have Crohn's disease which attacks my digestive trac[t]. They have also said I have costochondritis which attack[s] the cartil[a]ge in my chest. Both cause a lot of pain and one causes a lot of nausea. Dealing with both has caused some anxiety." (Tr. 116). Plaintiff has also gained weight, weighing 227 pounds at the time of his application. (Tr. 99).

Plaintiff has had one bowel resection surgery because of his Crohn's disease.[1] (Tr. 166, 168, 197). In August 2002, Plaintiff's gastroenterologist, Palani K. Raman, M.D., recommended a resection of Plaintiff's terminal ileum and cecum because he believed Plaintiff had "[s]evere [f]ibro-[s]tenotic Crohn's [d]isease" that would not "respond to any medical treatment". (Tr. 205). Dan Dietrich, M.D., removed two feet of Plaintiff's terminal ileum later that year. (Tr. 209).

Plaintiff went to the Shelby Hospital emergency room complaining of chest pain in May 2005. (Tr. 394). This was the first of many ER visits because of chest pain Plaintiff would make over the subsequent ten months. The attending physician, Arun Acharekar, M.D., reported Plaintiff appeared anxious, and after some testing, determined the cause of Plaintiff's chest pain to be unknown. (Tr. 395). Dr. Acharekar reported no acute cardiac injury, and gave Plaintiff some Xanax for his anxiety disorder. (Tr. 396). Two months later, Plaintiff went back to the emergency room at Shelby Hospital complaining of chest pain. (Tr. 371). Dr. Acharekar then noted a history of anxiety, had multiple electrocardiograms done, and diagnosed Plaintiff with acute chest pain, "cause unknown" but possibly musculoskeletal. (Tr. 372–373). Dr. Acharekar recommended rest and light

---

1. The record shows Plaintiff had a second bowel resection done in 2009. (Tr. 774–775). However, because this was not in the record at the time of the ALJ's decision, and no sentence six remand has been requested, the Court will not consider this evidence. *See* 42 U.S.C. § 405(g).

2

eating until the pain was gone. (Tr. 376).

Plaintiff was seen at the Shelby Hospital emergency room again in early August 2005 with sinus congestion, pain in his teeth, and drainage from his gum line. (Tr. 361). Scans of his bowel showed an unremarkable upper GI tract and a few small diverticula near the anastomotic site with the colon. (Tr. 368–369). He was diagnosed with acute sinusitis, toothache, and recurrent chest pain of chest wall etiology. (Tr. 362).

Plaintiff was also seen at the emergency room at Fisher-Titus Medical Center in August 2005, complaining of chest pain. (Tr. 165). The ER physician, Timothy J. Thomas, M.D., noted that Plaintiff's Crohn's disease had "been quiet for quite some time." (Tr. 168). Dr. Thomas described the pain as "initially intermittent," then constant for an hour and seemingly "accentuated somewhat by breathing." (Tr. 168). He ordered Aspirin and Nubain, which helped relieve Plaintiff's pain. (Tr. 168). Once admitted, the treating physician, Charles Resseger, D.O., noted Plaintiff's "long-standing history" of chest pain and Crohn's disease, and reported no abnormal findings. (Tr. 165). X-rays showed no infiltrates or effusions in the lungs and a normal heart size. (Tr. 175). A pulmonary perfusion scan showed no defects and a ventilation study was normal. (Tr. 176). An esophagogastroduodenoscopy was performed and resulted in normal findings. (Tr. 179). Dr. Resseger thus described the cause of Plaintiff's chest pain as uncertain, but "most likely" costochondritis. (Tr. 165).

Plaintiff returned to the Fisher-Titus emergency room a second time in late August 2005, where he was seen by Kristopher R. Brickman, M.D. (Tr. 186). Dr. Brickman reported Plaintiff complained of severe chest pain, numbness in his arms, trembling, and shortness of breath. (Tr. 186). Dr. Brickman noted Plaintiff was apprehensive, "quite anxious", and hyperventilating. (Tr. 186). He

3

found tenderness over Plaintiff's chest wall, but otherwise normal physical findings. (Tr. 187). In his opinion, Plaintiff had "an anxiety reaction that was compounding whatever chest discomfort issues" he was having, and therefore prescribed Ativan to lessen the anxiety. (Tr. 187).

Plaintiff visited the emergency room again in September 2005. (Tr. 180). This time, he presented with diarrhea, abdominal bloatedness, nausea, weakness, and dehydration. (Tr. 180). The treating physician, Walid M. Mahmoud, M.D., reported no abnormal findings and noted Plaintiff's mental status, judgment, and affect were "grossly intact and normal for age." (Tr. 180). Dr. Mahmoud diagnosed diarrhea and abdominal bloatedness, and ordered two liters of hydration. (Tr. 181). Plaintiff's stool was tested for bacteria, and no campylobacter, salmonella, shigella, yersinia, vibrio, or pathogenic E. coli were isolated. (Tr. 184). No cardiac abnormalities were discovered. (Tr. 195–196).

In October 2005, Plaintiff saw rheumatologist Carmen E. Gota, M.D., who made notes about Plaintiff's diarrhea up to that point: "[H]ad diarrhea off and on since April 2005, had 4–5 times a day of watery lo[o]se stools, was found to have Clebsiella pneumonia and citrobacter in the stool and was treated with antibiotics for 2 weeks. Diarrhea is better now, not watery[.]" (Tr. 154). Dr. Gota ordered a hepatitis panel, and Plaintiff tested negative for all forms of hepatitis. (Tr. 159).

Dr. Resseger treated Plaintiff several times throughout 2005 and 2006. In August 2005, Plaintiff saw Dr. Resseger several times and complained to him of diarrhea, blood in his stool, constant burning in his chest, and having yellow stool. (Tr. 222, 226). At that time, Dr. Resseger noted Plaintiff's pain seemed to be moving into his lungs. (Tr. 223). Two stool sample analyses ordered by Dr. Ressenger showed the pH of Plaintiff's stool to be too acidic, "reflective of a rapid transit time, e.g. diarrhea or loose stools." (Tr. 237, 250). Also in August, Plaintiff went to the

4

emergency room with nausea, sinus congestion, and chest soreness. (Tr. 356). He was diagnosed with nausea, atypical neuralgias, possible hyperventilation syndrome, and resolving costochondritis. (Tr. 357).

Plaintiff saw Dr. Resseger again in September, October, and December 2005, each time complaining of diarrhea, and sometimes complaining of chest pain. (Tr. 216–219). A transthoracic ultrasound, performed because of Plaintiff's chest pain, revealed no abnormal findings. (Tr. 251–252). Plaintiff was seen by Dr. Resseger twice in January 2006, complaining of chest pain, diarrhea, muscle pain, nausea, and muscle cramps. (Tr. 214–215). The following month, Dr. Resseger reported Plaintiff being "very depressed" after having arm burning and a headache. (Tr. 213).

Plaintiff went to the emergency room at Shelby Hospital in December 2005, complaining of dizziness, nausea, and bloody diarrhea. (Tr. 345). A rectal examination showed bloody stool in the ampulla. (Tr. 346). The attending physician, Teresita Morales-Yurik, M.D., diagnosed Plaintiff with mild to moderate dehydration and bloody diarrhea, then treated him with IV fluids. (Tr. 346). Because of his history of chest pain, an electrocardiogram was done and produced normal findings. (Tr. 346). Dr. Morales-Yurik noted concerns about a possible recurrence of Plaintiff's Crohn's disease. (Tr. 346).

In January 2006, Plaintiff returned to the Shelby Hospital emergency room because of worsening diarrhea. (Tr. 334). Treatment notes indicate he had yellowish stool. (Tr. 334). A CT scan was done, and the radiologist interpreting it found no abnormalities. (Tr. 340). Joseph J. Bocka, M.D., the attending physician, diagnosed diarrhea, cramps, and mild dehydration. (Tr. 335). Plaintiff was treated with Bentyl, Flagyl, and five days of steroids. (Tr. 335).

Plaintiff went to the emergency room twice in February 2006. The first time, he presented with a headache, nausea, and some intermittent chest tightness. (Tr. 329). The attending physician, Michael Jarosick, D.O., remarked that Plaintiff's chest pain had "been a chronic symptom[,] virtually continuous for ten months." (Tr. 329). He also reported Plaintiff had been having "diarrhea for the past ten months." (Tr. 329). Plaintiff was diagnosed with a headache, a sinus infection, and chronic diarrhea. (Tr. 332). He was treated with a nasal spray and IV fluids. (Tr. 330–331).

The second time, Plaintiff complained of chest pain that began in his sternum and moved throughout his entire thorax. (Tr. 322). This pain caused itching and burning when Plaintiff breathed. (Tr. 322). The attending physician reported Plaintiff "had watery stool for the" prior eight months. (Tr. 322). The ER kept Plaintiff for observation, made unremarkable findings, then discharged him "with chest pain of unknown etiology". (Tr. 323, 325).

The next month, Plaintiff was examined by Dr. Raman and complained of diarrhea and abdominal pain. (Tr. 209). According to Dr. Raman's notes, Plaintiff reported having "up to eight loose bowel movements daily" and "lower abdominal pain at least one or two times a week for the past eight months." (Tr. 209). Dr. Raman wrote in his impression, "Persistent diarrhea and abdominal pain in a patient who had resection of [two] feet of ileum and right hemicolectomy . . . This is consistent with recurrence of Crohn's disease." (Tr. 210). Dr. Raman performed a colonoscopy later that month and found no  fistula, fissures, polyps, colon cancer, diverticulosis, bleeding, or internal hemorrhoids, but did find active Crohn's disease of the ileum "with multiple ulcerations seen" at the "ileo–colic anastomosis." (Tr. 197). Dr. Raman also noted a mild stricture at the anastomosis and took multiple biopsies. (Tr. 197). According to pathologist John H. Burgess, M.D., the biopsies of Plaintiff's cecum showed "superficial benign colonic mucosa." (Tr. 203). The

6

biopsies of Plaintiff's ileocolic anastomosis showed "[i]leocolic mucosa with focal active inflammation, consistent with the clinical impression of Crohn's disease." (Tr. 204). The pathology report noted a clinical history of diarrhea. (Tr. 204).

Plaintiff returned to the emergency room in May 2006, complaining of what he described as a Crohn's exacerbation, involving "multiple diarrheal stools", nausea, decreased oral intake, and generalized aches and pains that included chest pain. (Tr. 198). He was seen by John Basch, M.D., who treated him with IV fluids and diagnosed an "acute exacerbation of Crohn ileitis with dehydration." (Tr. 198–199). Later the same month, Plaintiff was seen at the emergency room again for "epigastric pain that radiates into his chest and back." (Tr. 290). The attending physician, Dr. Morales-Yurik, noted Plaintiff felt dehydrated because he had over ten days of diarrhea. (Tr. 290). On physical examination, Dr. Morales-Yurik found hyperactive bowel sounds. (Tr. 290). An EKG produced unremarkable findings. (Tr. 293). Plaintiff was again treated with IV fluids and advised against eating fatty or spicy foods. (Tr. 291). He later underwent IV remicade infusions. (Tr. 277–282, 299–303).

Plaintiff returned again to the emergency room at Shelby Hospital in October 2006, complaining of dizziness, diarrhea, thirst, and muscle aches. (Tr. 272). Attending physician G. Mark Seher, M.D., noted a clinical impression of chronic diarrhea and mild dehydration. (Tr. 272). Dr. Seher remarked that Plaintiff had been compliant with his Crohn's medication. (Tr. 437).

In March 2007, Plaintiff went to the Mansfield Hospital emergency room complaining of an epigastric burning sensation and nausea. (Tr. 421). Radiologist Lance Cropp, D.O., noted multiple calcifications present on Plaintiff's pelvis as well as degenerative changes at the thoracolumbar junction. (Tr. 428). Plaintiff was given five days of prednisone for a possible Crohn's exacerbation

7

and also diagnosed with gastritis. (Tr. 421–421, 424).

In May 2007, Plaintiff was seen by Douglas L. Seidner, M.D. (Tr. 572). Dr. Seidner reported one to two loose bowel movements a day. (Tr. 572). In the middle of the month, he went to the Shelby Hospital emergency room because of vomiting with dehydration. (Tr. 652–653). Near the end of the month, Plaintiff was admitted to the Cleveland Clinic for two days because of abdominal cramps. (Tr. 570–571). He had also been complaining of dizziness, tingling in his neck, and stomach spasms. (Tr. 643). The attending physician, Thadeo Catacutan, M.D., reported Plaintiff's Crohn's had been in remission until he began having diarrhea and abdominal cramps. (Tr. 571). While in the hospital, Plaintiff had another colonoscopy performed, which showed "widespread superficial ulceration" in the ileum and anastomosis. (Tr. 598). Plaintiff was treated with a course of prednisone, to be tapered off after eight weeks. (Tr. 571). During this time on prednisone, Plaintiff's diarrhea and abdominal pain subsided. (Tr. 566–567).

In September 2007, Plaintiff went to the Mansfield Hospital emergency room complaining of diarrhea, weakness, and muscle aches. (Tr. 631). The records indicate he had been having diarrhea for a month at that point and appeared "somewhat dehydrated". (Tr. 631). He was treated with IV fluids and improved. (Tr. 631). This was deemed an exacerbation of his Crohn's disease. (Tr. 632). Later in the month, Plaintiff followed up with Dr. Seidner "for management of his Crohn's disease." (Tr. 560). At that time, Dr. Seidner reported "one formed bowel movement each day" and "mild rectal bleeding". (Tr. 562, 566). After noting Plaintiff's recent hospital admissions for "watery diarrhea, abdominal pain", he prescribed more steroids and Ativan for flares of Plaintiff's Crohn's disease. (Tr. 562, 565).

Plaintiff was seen at the Shelby Hospital emergency room again in November 2007,

8

complaining of nausea, dizziness, and chest pain. (Tr. 620). The attending physician, James Catalano, M.D., noted "[h]e does have diarrhea", which is "pretty chronic for him." (Tr. 620). He was treated with IV fluids. (Tr. 621).

Plaintiff returned to the Shelby Hospital emergency room in May 2008, complaining of nausea and epigastric pain. (Tr. 612). Dr. Acharekar reported the cause of his pain unknown, and suggested a possible gallbladder disease. (Tr. 613).  In June 2008, Plaintiff had a colonoscopy performed at the same time as an esophagogastroduodenoscopy, and it showed active Crohn's disease, hemorrhoids, and moderate gastroduodenitis. (Tr. 606).

In the summer of 2008, Plaintiff was seen multiple times at Mercy Family Practice of Shiloh for his epigastric pain. (Tr. 764, 769, 771). Punita Kothari, M.D., diagnosed chronic cholecystitis and diffuse cholesterolosis, and prescribed a course of prednisone. (Tr. 765, 769). An ultrasound also suggested Plaintiff had gallbladder sludge. (Tr. 770).

Plaintiff began seeing Dr. Detrich again in 2009. In Dr. Detrich's most recent records before the ALJ's hearing, in May 2009, he reported Plaintiff was "having lots of diarrhea" that was "worsening". (Tr. 776–777).

Since filing for social security, Plaintiff has had various consultative examinations conducted. Plaintiff's physical residual functional capacity (RFC) was assessed by state consultant Myung Cho, M.D., in March 2007. (Tr. 519–526). Dr. Cho determined Plaintiff was capable of occasionally lifting or carrying 50 pounds, frequently lifting or carrying 25 pounds, and sitting or standing for six hours during an eight-hour workday. (Tr. 520).  Dr. Cho noted a recent colonoscopy that showed active Crohn's disease of the ileum with multiple ulcerations. (Tr. 521). He also concluded Plaintiff had no postural, manipulative, communicative, or environmental limitations. (Tr.

521–523). This assessment was conducted without the benefit of treating source opinions in the file for Dr. Cho to consider. (Tr. 525).

For his alleged mental impairments, psychologist Curt S. Ickes, Ph.D., evaluated Plaintiff in January 2007. (Tr. 413). Dr. Ickes reported good cognitive functioning and concluded Plaintiff was not significantly impaired in his ability to relate well with others; to understand, remember, and follow instructions; and to maintain attention, concentration, persistence, and pace. (Tr. 415–416). But Dr. Ickes also determined Plaintiff's ability to withstand the stress and pressures associated with day-to-day work activities was moderately impaired. (Tr. 416). However, psychologist Catherine Flynn, Psy.D., evaluated Plaintiff in January 2007 and concluded Plaintiff had no medically determinable mental impairment. (Tr. 505, 517).

Administrative Hearing

Plaintiff appeared with counsel before the ALJ in a video-teleconferencing hearing on June 4, 2009. (Tr. 19). Also appearing was a vocational expert (VE).

In terms of Plaintiff's past relevant work, he testified he worked at a printing factory that closed down in 2006. (Tr. 23). He said he had  worked as a press operator at the factory for nine years before being laid off in either 2003 or 2004. (Tr. 24). He has not worked since being laid off. (Tr. 25). When asked to describe in his own words what it is that keeps him from working, Plaintiff responded, "[t]he constant inflammation and stuff and the pain. Because of where it's located at it pushes up on my ribcage and stuff. Sometimes it's hard to breathe. The nausea, the diarrhea." (Tr. 26). Plaintiff said he has constant pain and pressure in his stomach that prevent him from sitting up straight and standing. (Tr. 30–31).

Ultimately, Plaintiff testified "the constant use of the restroom" is what prevents him from

finding a job. (Tr. 30). He said normally, he needs to use the restroom five or six times a day for up to 20 minutes each time. (Tr. 30). According to his testimony, each bowel movement is diarrhea. (Tr. 33). Plaintiff said after he eats something, he will have diarrhea within 20 minutes. (Tr. 35). "Everything I eat", he testified, "makes me sick." (Tr. 35). This, he asserted, is an unavoidable consequence of his Crohn's disease. (Tr. 33–34). Plaintiff testified he had been hospitalized several times for dehydration resulting from his diarrhea. (Tr. 34). Furthermore, he said he has followed the diet recommendations to help manage the diarrhea, but they do not help. (Tr. 35).

Plaintiff spoke about his alleged mental impairments. He said he was prescribed Ativan after having a few severe anxiety attacks, but he has not taken his Ativan for a while. (Tr. 27–28). Plaintiff said his anxiety attacks were related to his physical situation, "[b]ecause [the doctors] didn't know what was going on." (Tr. 28). This was caused by a fear of dying. (Tr. 36). He also said he gets nervous about being in and around crowds by himself. (Tr. 37).

Plaintiff testified he is unable to eat a full meal because of the pressure in his stomach that results. (Tr. 34). Nonetheless, he said he does not take pain medication; he has "never really been one for" taking pain medication. (Tr. 27). Plaintiff also attributed his weight gain to the prednisone he was prescribed for his inflammation. (Tr. 32–33).

Plaintiff gave insight into his residual functional capacity. He said he drives to the store about once a week. (Tr. 23). He testified his typical day involves sitting around the house and deck, though he can cook and do laundry for himself. (Tr. 29). He said he can also bathe, groom, and dress himself. (Tr. 29). Plaintiff mentioned his prior hobbies, such as hunting, metal detecting, and playing on a pool shooting team, but said he has not done these things since 2005. (Tr. 30, 37).

The VE also testified at the hearing. (Tr. 40). The VE classified Plaintiff's past relevant work

11

as a paper splitting machine operator as being at the medium exertional and mid-range semiskilled levels. (Tr. 41). The ALJ then proposed a hypothetical to the VE; he asked the VE to assume an individual of the claimant's age, education, and work experience, but limited to medium work activity not performed at heights or using ladders, ropes, or scaffolding, and not entailing more than occasional ramps, stairs, stooping, crouching, crawling, and kneeling. (Tr. 41). This hypothetical person would also be precluded from being around dangerous, moving machinery and doing any overhead lifting or reaching. (Tr. 41–42). The VE testified that such a hypothetical individual would not be able to perform Plaintiff's past relevant work. (Tr. 42). The VE then gave examples of jobs the hypothetical individual would be able to perform: hand packer, industrial cleaner, and van driver. (Tr. 42). According to the VE's testimony, each of these jobs accounts for at least 1,000 positions in the region. (Tr. 42).

The ALJ then asked the VE to assume a slightly more restricted hypothetical individual, unable to perform more than light work. (Tr. 42). In response, the VE changed his examples of alternative jobs such a person could perform, this time reciting the jobs of small products assembler, parking lot attendant, and recreation facility attendant. (Tr. 43). Similarly, each of these jobs purportedly accounts for at least 1,000 positions in the region. (Tr. 43).

The ALJ then asked the VE about one final hypothetical individual. This individual has the same limitations as before but also has the additional limitation of having a chronic digestion and intestinal issue that requires the person to be off task "at the very least" 25 percent of the workday. (Tr. 43). The VE said bluntly, "Your Honor, being off task for 25 percent of the workday would give the inability to maintain work pace and complete a normal workday. It would eliminate all work." (Tr. 43).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. §§ 423(a)(1)(E), 381a. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1.      Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The Court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)–(f), 416.920(b)–(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

The ALJ concluded Plaintiff has the severe impairment of Crohn's disease, but that it did not meet or medically equal one of the listed impairments. (Tr. 12). In terms of Plaintiff's RFC, the ALJ determined Plaintiff is capable of performing light work, except he cannot work around heights or dangerous machinery, cannot lift or reach overhead, cannot climb ladders, ropes, or scaffolding, and is limited to occasional climbing of ramps and stairs, stooping, crouching, crawling, and kneeling.

14

(Tr. 13). In considering Plaintiff's symptoms, the ALJ said Plaintiff's statements concerning the intensity, persistence, and limiting effects of them are not credible to the extent they are inconsistent with the aforementioned RFC. (Tr. 13). With regard to Plaintiff's Crohn's disease, the ALJ found as follows:

> In terms of [Plaintiff's] alleged Crohn's disease, the medical record establishes that reported [sic] in October 2005 that [sic] he was diagnosed with Crohn's in 2001. He reported that he had been experiencing diarrhea off and on since April 2005, but that it was better since he had been treated with antibiotics. He had not been losing weight, and did not suffer from malaise or fevers. He denied abdominal discomfort. The claimant was observed to be well[-]appearing and in no acute distress. His physical examination was normal. In December 2005, [Plaintiff] had a normal complete abdominal series. [Plaintiff's] March 2006 colonoscopy showed status post right hemi-colectomy and terminal ileal resection for earlier Crohn's treatment and active Crohn's disease of the ileum. Otherwise, the colon was normal. In January 2006 and in May 2006, [Plaintiff] was treated for mild Crohn's exacerbation with dehydration. He had good improvement in his condition and he was admonished to continue with current medications. There has been no significant weight loss due to Crohn's disease.

(Tr. 13–14) (internal citations omitted).

After initiating this lawsuit, Plaintiff filed two letters (Doc. 14, 16) with the Court that the Court shall liberally construe as Plaintiff's arguments on the merits. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972). In these letters, Plaintiff appears to argue that the ALJ's decision is incorrect because it did not fully consider the effects of Plaintiff's Crohn's disease. Plaintiff mentioned that he must "plan every trip around bathroom stops" because of his diarrhea, and has "constant nausea and pain".

The Court has reviewed the entire transcript for substantial evidence supporting the ALJ's decision and can find no such support for the ALJ's treatment of Plaintiff's diarrhea. Accordingly, the Court concludes the ALJ failed to adequately consider the nonexertional limitation of frequent bathroom use imposed by Plaintiff's diarrhea.

15

Plaintiff's Nonexertional Limitation

The regulations provide that claimants may have both "exertional" and "nonexertional" limitations on their ability to work. 20 C.F.R. § 404.1569a(a). Whereas exertional limitations affect a claimant's ability to meet the strength demands of jobs (e.g., sitting, standing, walking, lifting, carrying, pushing, or pulling), nonexertional limitations affect a claimant's ability to meet the non-strength demands of jobs. 20 C.F.R. § 404.1569a(a).

The need for frequent restroom use, and frequent diarrhea in particular, has been classified by other courts as a nonexertional limitation. *See, e.g., Dambrowski v. Astrue*, 590 F. Supp. 2d 579, 584 (S.D.N.Y. 2008) ("[P]laintiff had an obvious nonexertional impairment that he claimed prevented him from working: his need to use the bathroom with unusual frequency."); *Haynes v. Heckler*, 716 F.2d 483, 485 (8th Cir. 1983) (noting the ALJ erred in finding an ability to perform sedentary work while failing to recognize colon discomfort and recurrent diarrhea as nonexertional limitations); *Gonzales v. Sullivan*, 914 F.2d 1197, 1202 (9th Cir. 1990) ("Even though the Secretary found substantiating evidence for appellant's bladder problem, he . . . found that appellant was not disabled. The Secretary did not explain how appellant's incontinence affects his ability to work or whether incontinence constitutes a nonexertional limitation in this case. This omission is error.") (citations omitted). Similarly, this Court recently remanded an ALJ's decision for failing to adequately consider the nonexertional limitations caused by a claimant's urostomy appliance. *Bruce v. Comm'r of Soc. Sec.*, 2011 WL 3647929, at *7–9 (N.D. Ohio 2011) (report and recommendation adopted by *Bruce v. Comm'r of Soc. Sec.*, 2011 WL 3651109 (N.D. Ohio 2011)). Here, the ALJ dismissed any nonexertional limitation imposed by Plaintiff's diarrhea, saying Plaintiff reported "he had been experiencing diarrhea off and on since April 2005, but that it was better since he had been

16

treated with antibiotics." (Tr. 13). To make this determination, the ALJ appears to have relied solely on Dr. Gota's note from October 2005 that says Plaintiff "was treated with antibiotics for [two] weeks. Diarrhea is better now, not watery[.]" (Tr. 154). But the thrust of Dr. Gota's statement is that Plaintiff's diarrhea was not as watery and bacteria-laden as before; Dr. Gota was *not* saying Plaintiff's diarrhea had ceased or become less frequent. The phrase "not watery" clarifies what Dr. Gota meant by the diarrhea being "better now"; this is also implied by the prior sentence which remarks that Plaintiff was having "watery lo[o]se stools". (Tr. 154). The meaning of "better now" is made even more apparent by the fact Dr. Gota was describing "Clebsiella pneumonia and citrobacter" bacteria found in Plaintiff's diarrhea, which "was treated with antibiotics for [two] weeks". (Tr. 154). The fact that she reported his diarrhea as better most likely referred to the fact that less bacteria was found in it. This explains why the ER physicians who saw Plaintiff the following month tested his stool for abnormal bacteria and found none. (Tr. 184).

Indeed, the only logical interpretations of this medical report from Dr. Gota are that Plaintiff's diarrhea became less watery and contained less bacteria after treatment with antibiotics. But this does not mean Plaintiff's diarrhea became less frequent; there is simply nothing in the medical records supporting such a finding. Moreover, any lessening in severity or frequency of Plaintiff's diarrhea was short-lived. The very month after this report from Dr. Gota, Plaintiff went to the emergency room because of "dehydration from diarrhea." (Tr. 180). In fact, Plaintiff returned to the emergency room because of diarrhea numerous times after seeing Dr. Gota. (Tr. 180, 329, 322, 334, 345, 620, 631). Meanwhile, there is no evidence suggesting Plaintiff's diarrhea ceased or became less frequent at any point, other than temporarily while on steroids. The overwhelming indication left by the objective medical evidence is that Plaintiff suffers from rather frequent,

17

unavoidable flare-ups of his Crohn's disease that result in excessive diarrhea – diarrhea so excessive that he has often had to seek medical treatment for dehydration.

Taking Plaintiff's testimony to the extreme, he spends up to two hours a day using the restroom because of his Crohn's disease. (Tr. 30). Of course, an ALJ is not required to accept a claimant's subjective complaints, as there must be objective medical evidence in the record of any medical condition. *Cunningham v. Astrue*, 360 F. App'x 606, 612 (6th Cir. 2010) (citing *Jones*, 336 F.3d at 475). But here, there is objective medical evidence fully supporting Plaintiff's subjective claims about frequent diarrhea, and a lack of substantial evidence to the contrary. The same record the ALJ relied on to conclude Plaintiff's diarrhea "is better" reports Plaintiff had diarrhea 4–5 times per day. (Tr. 154). Emergency room records from the month after Plaintiff's diarrhea was reported as "better" show he still had diarrhea, so much so that he became dehydrated. (Tr. 180, 181). In March 2006, Plaintiff's treating gastroenterologist, Dr. Raman, noted "persistent diarrhea" and remarked that such a symptom was consistent with a recurrence of Crohn's disease. (Tr. 210). Several records from various times after the alleged onset date report a clinical impression or history of diarrhea. (Tr. 204, 269, 272, 315, 317, 428, 755). Dr. Resseger even ordered two stool sample analyses, both of which found the pH of Plaintiff's stool to be "reflective of a rapid transit time, e.g. diarrhea or loose stools." (Tr. 237, 250). And Plaintiff's subjective allegations are entirely consistent with the usual effects of Crohn's disease, as described by the form Plaintiff's doctors gave to him explaining the disease. (Tr. 286).

The record, frankly, is dominated by medical evidence of Plaintiff's frequent diarrhea (Tr. 180, 181, 204, 209, 210, 216–219, 226, 237, 250, 269, 272, 290, 329, 332, 334, 342, 346, 527, 620, 631, 672, 776–777), and devoid of evidence indicating it has ceased or become less frequent since

18

the report by Dr. Gota that the ALJ relied on.[2] If anything, there is record evidence that the frequency may have increased to up to eight times per day. (Tr. 209). In fact, despite the ALJ's claim that Plaintiff's diarrhea had improved, treating source records from less than two months before the ALJ's hearing in 2008 reported Plaintiff "having lots of diarrhea" and a "recent worsening of diarrhea". (Tr. 776, 777).

Clearly, the objective medical evidence shows Plaintiff's frequent diarrhea has not ceased, and it corroborates Plaintiff's subjective allegations. There is by no means substantial evidence in the record to contradict this. While the record shows Plaintiff's diarrhea can vary from once or twice a day all the way to eight times a day (Tr. 154, 572, 209), it unquestionably establishes that flare-ups of Plaintiff's active Crohn's disease occur consistently and cause him to have the nonexertional limitation of frequent bathroom use. Therefore, to the extent the ALJ concluded Plaintiff does not have a nonexertional limitation of frequent bathroom use caused by diarrhea, this finding is unsupported by substantial evidence and requires remand.

The Court does not render an opinion as to whether Plaintiff's frequent bathroom use qualifies him for benefits. Rather, the Court opines only that the Commissioner must properly consider this well-established nonexertional limitation and analyze it in light of the VE's testimony that such a limitation, if severe enough, would preclude all work. The ALJ erred by finding Plaintiff did not have this nonexertional limitation in the absence of medical evidence supporting such a conclusion and in the face of substantial evidence to the contrary. On remand, the extent to which Plaintiff's frequent diarrhea would require him to be off task during the workday should be

---

2. The Court also notes that Dr. Gota is a rheumatologist. (Tr. 566). Her records about Plaintiff's diarrhea are not entitled to the same amount of deference as the records of those physicians who treated Plaintiff for his diarrhea or who specialize in the area. *See* 20 C.F.R. § 416.927(d)(2)(ii).

determined so that the VE's testimonial guidance can be applied.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and applicable law, the Court finds the Commissioner's decision denying DIB and SSI unsupported by substantial evidence. The undersigned therefore recommends the ALJ's decision be reversed and the case remanded to the Commissioner for further proceedings consistent with this opinion.

      s/James R. Knepp, II      

United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).